UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MACCO PROPERTIES, INC., | ) | Case No. 10-16682-R |
| | ) | Chapter 7 |
| | ) | |
| NV BROOKS APARTMENTS, LLC, | ) | Case No. 10-16503-R |
| | ) | Chapter 7 |
| Debtors. | ) | (Jointly Administered) |

| | | |
|---|---|---|
| MICHAEL E. DEEBA, TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 12-1118-R |
| | ) | |
| PINKERTON & FINN, P.C., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| COBBLESTONE APARTMENTS | ) | |
| OF TULSA, LLC; LARRY D. AND | ) | |
| JEANETTE A. JAMISON FAMILY | ) | |
| TRUST; AND JACKIE L. HILL, JR., | ) | |
| | ) | |
| Intervenors. | ) | |

## ORDER GRANTING TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Trustee's Motion for Summary Judgment and Brief in Support

("Motion") (Adv. Doc. 102) filed by Plaintiff Michael E. Deeba, Trustee ("Trustee");

Defendant's Response and Brief Opposed to Plaintiff's Motion for Summary Judgment

("Response") (Adv. Doc. 103) filed by Defendant Pinkerton & Finn, P.C. ("P&F"); and

Trustee's Reply in Support of Motion for Summary Judgment and Brief in Support (Adv.

Doc. 104) ("Reply").

B    16-044

Trustee alleges a single cause of action against P&F, one in which he contends that a few weeks after filing its Chapter 11 petition, Debtor MACCO Properties, Inc. ("MACCO") wire-transferred a total of $61,288.05 from its general operating bank account to P&F in payment of a prepetition debt. Trustee contends that the transfers are avoidable under 11 U.S.C. § 549(a), as they were not authorized by statute or by the Court, and seeks to recover their value from P&F under 11 U.S.C. § 550(a).

P&F admits that it received $61,288.05 from MACCO, but asserts that the funds transferred by MACCO were not property of the bankruptcy estate, but instead were funds MACCO received from a related entity that was not in bankruptcy, and that such funds were "earmarked" for payment to P&F. P&F also contends that the transfers were made "in the ordinary course" of MACCO's business, and thus MACCO was not required to obtain authorization from the Court.[1]

**JURISDICTION**

The Court has jurisdiction over this "core" proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(b)(1) and 157(b)(2)(E), and Rule 81.4(a) of Local Civil Rules of the United States District Court for the Western District of Oklahoma.[2]

---

[1]Although not cited by P&F, it appears that its "ordinary course of business" argument arises out of 11 U.S.C. §§ 1108 and 363(c).

[2]On December 23, 2015, District Court Judge T. DeGiusti denied P&F's motion for withdrawal of the bankruptcy reference, and in so doing, concluded that this is a "core" bankruptcy matter that does not involve a "Stern" claim, and therefore this Court may enter a final order and judgment in this case. Judge DeGiusti also concluded that P&F is not entitled to a jury trial.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[3] "A fact is 'material' if under the substantive law it could have an effect on the outcome of the lawsuit."[4]   "An issue is 'genuine' if 'a rational jur[or] could find in favor of the nonmoving party on the evidence presented.'"[5] The Court must view the record on summary judgment in the light most favorable to, and all reasonable inferences drawn in favor of, the non-moving party– in this case, P&F.[6]

Trustee's Motion contains nine numbered paragraphs setting forth detailed facts relating to the elements of his claim, each supported by evidentiary materials attached to the Motion.  According to Local Rule 7056-1(C), the non-movant's response brief shall–

> begin with a section stating, by paragraph number, each of the movant's facts to which the non-movant contends a genuine issue exists, and shall refer with particularity to those portions of affidavits, discovery materials, Documents, and other relevant parts of the record before the Court upon which the non-movant relies to dispute the movant's fact.[7]

---

[3]Fed. R. Civ. P. 56(a), made applicable to this proceeding by Bankruptcy Rule 7056.

[4]Adams v. American Guarantee and Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000), citing EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000).

[5]Id., quoting Horizon, 220 F.3d at 1190.

[6]See Gross v. Hale-Halsell Co., 554 F.3d 870, 875 (10th Cir. 2009).

[7]Local Rule 7056-1(C).

3

P&F did not controvert any of the detailed facts contained in the nine paragraphs or take issue with the supporting evidence. The Court deems all of Trustee's material and properly supported statements of fact admitted by P&F.[8]

In its Response, P&F offers additional facts it deems material and sufficient to defeat summary judgment. Local Rule 7056-1(C) provides–

> If the non-movant contends that other material facts exist which preclude summary judgment, the non-movant shall set forth each such material fact in a separately numbered paragraph and shall refer with particularity to those portions of affidavits, discovery materials, Documents, and other relevant parts of the record before the Court upon which the non-movant relies.[9]

P&F does not refer with particularity to any evidentiary material to support its additional material facts. Attached to the Response is an affidavit signed by Jennifer Price (the "Price Declaration"), but the Price Declaration does not directly correspond to the additional facts set forth in the Response. For the purpose of this Motion, the Court will determine whether Ms. Price's proffered testimony, taken as a whole, would be sufficient either to create a genuine issue of material fact or to undermine Trustee's claim as a matter of law.

## MATERIAL UNDISPUTED FACTS

MACCO filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 2, 2010 (the "Petition Date"). MACCO's president, Lew S. McGinnis

---

[8]See Fed. R. Civ. P. 56(e)(2) (assertions of fact not properly addressed in a response may be considered undisputed for the purposes of the motion); Local Rule 7056-1(C) ("All properly supported material facts set forth in movant's statement shall be deemed admitted for the purpose of summary judgment unless specifically controverted by a statement of the non-movant that is supported by evidentiary material.").

[9]Local Rule 7056-1(C).

4

("McGinnis"), assumed the duties and responsibilities of the debtor-in-possession, and managed and operated MACCO's business for seven months. McGinnis's management of MACCO was terminated after the Court approved the appointment of Trustee as Chapter 11 Trustee of the MACCO bankruptcy estate.[10]

Prior to the Petition Date, P&F provided legal representation to MACCO, McGinnis, and several entities owned and controlled by MACCO in connection with their joint defense in four separate civil lawsuits. In addition to MACCO and McGinnis, P&F represented SEP Sunnyview Investors, LLC and MIP Overlake Apartments, LLC in an action filed in Utah; SEP Cobblestone Apartments, LLC in the action filed in Tulsa County; LP Linwood Village Apartments, LLC in the action filed in Kansas; and AP Bristol Park Apartments, LLC, AP Canyon Creek Apartments, LLC, AP Foxfire Apartments, LLC, and AP Tower Crossing Apartments, LLC in an Oklahoma County lawsuit.

On October 1, 2010, approximately one month prior to the Petition Date, P&F sent McGinnis four invoices documenting that P&F was owed the following sums:

- $18,404.98 for services rendered in the Utah litigation;

- $35,675.61 for services rendered in the Tulsa County litigation;

- $2,967.24 for services rendered in the Oklahoma County litigation; and

- $4,240.85 for services rendered in the Kansas litigation.

---

[10]On December 16, 2013, MACCO's Chapter 11 case was converted to a case under Chapter 7 and Trustee was appointed trustee of MACCO's Chapter 7 estate.

At some point prior to the Petition Date, MACCO attempted to pay P&F's invoices by check, but the checks were dishonored. On November 12, 2010, ten days after the Petition Date, MACCO made three wire transfers to P&F from MACCO's debtor-in-possession account at NBC Bank (the "NBC Account") in the amounts of $35,675.01, $2,967.21, and $4,240.85. On November 16, 2010, MACCO wire-transferred $18,404.98 to P&F from the same account. P&F admits that the transfers, totaling $61,288.05, constituted payment for the legal services that were billed on October 1, 2010. Neither McGinnis (on behalf of MACCO) nor P&F requested the Court to authorize MACCO's payment of P&F's prepetition invoices.

**P&F's ADDITIONAL FACTS**

As noted above, the only evidentiary material provided by P&F in opposition to Trustee's Motion is the Price Declaration. Jennifer Price was and is the sole shareholder of MACCO. Her testimony as to the circumstances of the transfers is as follows:

4.   With regard to the wire transfers made to Pinkerton and Finn, P.C., those transfers were made, first and foremost, with funds in the Maaco [sic] debtor-in-possession account that were from a related, non-debtor entity, and specifically earmarked for payment of those legal fees.

5.   The wire transfers were necessary to cover checks that were written pre-petition that were not honored by the bank once Maaco [sic] filed for bankruptcy in November.

6.   Lew McGinnis and I specifically talked to the U.S. Trustee about how to handle payment on Pinkerton's bills since the checks were not honored, and were told that the entities could not lend each other money, but that if the funds were not Maaco's [sic] to begin with, it was acceptable to transfer the funds to avoid incurring additional post-petition debt.

6

7.    Therefore in order to ensure competent legal representation, Lew McGinnis and I transferred funds into Maaco's [sic] account with the specific purpose of using those funds to pay Pinkerton's legal bills, and then arranged for the wire transfers.[11]

## DISCUSSION

A.    The undisputed facts establish a *prima facie* case for avoiding the transfers.

Under Section 549(a) of the Bankruptcy Code, Trustee "may avoid a transfer of property of the estate . . . that occurs after the commencement of the case; and . . . that is not authorized under this title or by the court."[12] The undisputed facts establish that (1) a total of $61,288.05 was transferred from MACCO's NBC Account to P&F; (2) the transfers occurred after MACCO commenced its bankruptcy case; (3) the Bankruptcy Code does not authorize a debtor-in-possession to pay prepetition unsecured debt before a plan is confirmed;[13] and (4) no court order authorized MACCO to pay P&F's prepetition unsecured claim.

P&F concedes, as it must, that the transfers were made by MACCO from MACCO's NBC Account, but contends that the funds transferred were "non-debtor funds."[14] Establishing that the transferred funds were property of the estate requires consideration of the statutory definition of the bankruptcy estate. Under 11 U.S.C. § 541(a)(1), the estate is

---

[11]Price Declaration, ¶¶ 4-7.

[12]11 U.S.C. § 549(a).

[13]See, e.g., In re Berry Good, LLC, 400 B.R. 741, 745-47 (Bankr. D. Ariz. 2008).

[14]Response, ¶ 5.

7

comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." Under 11 U.S.C. § 541(a)(7), interests in property "that the estate acquires after the commencement of the case" also become property of the estate.

Under relevant state law, the relationship between a bank and its depositor is one of debtor and creditor.[15] An account holder's right to demand or direct payment of deposits credited to its account is a chose of action, analogous to a receivable.[16] Even if all funds deposited in the NBC Account did in fact flow from MACCO's non-debtor subsidiaries, as P&F contends, only MACCO possessed the right to demand NBC Bank to, in effect, repay the bank's debt to MACCO. The exclusive right to direct and control the ultimate fate of all deposits into the NBC Account – which was, after all, a debtor-in-possession account– was

---

[15]Allied Fidelity Ins. Co. v. Bank of Oklahoma, N.A., 1995 OK 36, 894 P.2d 1101, 1104.

[16]See, e.g., Boyer v. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, PA (In re USA Diversified Products, Inc.), 100 F.3d 53, 55 (7th Cir. 1996) (property of the estate "includes the interest that a depositor has in the money in his account, more precisely the money owed him by the bank by virtue of the account").

Under Oklahoma law, and general commercial law,

[t]he specific money deposited [in a bank] does not remain the money of the depositor, but becomes the property of the bank, to be invested and used as it pleases; its obligation to the depositor is only to pay out an equal amount upon his demand or order[.] . . . The bank cannot discharge its liability to account with the depositor to the extent of a deposit, except by payment to him, or to the holder of a written order from him, usually in the form of a check.

Allied Fidelity, 894 P.2d at 1104 (quoting Leather Manufacturers' Nat'l Bank v. Merchants' Nat'l Bank, 128 U.S. 26, 34 (1888)).

held by MACCO and as such was property of the estate.    Accordingly, Trustee has
established all elements required to prevail on its Section 549 claim.

        B.    <u>P&F's evidentiary materials are not sufficient to create a genuine issue of fact
as to whether certain deposits were earmarked for payment of P&F's
prepetition fees.</u>

     In its Response, P&F contends that Cobblestone, one of the joint defendants in the
Tulsa County lawsuit, deposited funds into MACCO's NBC Account for the express purpose
of paying P&F's invoices.[17]    P&F argues that such "earmarked" funds are not property of the
estate, and therefore the estate cannot avoid a post-petition transfer of such funds under
Section 549(a). P&F submits that "whether the funds were earmarked is a disputed material
fact" that precludes summary judgment in favor of Trustee.[18]

     The earmarking doctrine is not found in the Bankruptcy Code.    It is a judicially-
created equitable doctrine that exempts from avoidance certain *prepetition* transfers made by
a debtor that otherwise meet all the elements of a preference under Section 547 of the
Bankruptcy Code. As such, recognition and application of the earmarking doctrine varies
from court to court, circuit to circuit.    Generally, however, courts employ the fiction of
excluding earmarked funds from the scope of "property of the debtor" in situations where
funds are loaned to the debtor for the explicit purpose of preferentially paying one particular
creditor of the debtor.    Finding that "earmarked" funds are not property of the debtor, even

---

    [17]Response, ¶ 9.  Cobblestone was a defendant in the Tulsa County lawsuit only.  P&F
does not even allege that the defendants in the other three lawsuits made deposits to cover
payment of their legal fees.

    [18]Response, ¶ 10.

though they pass through a debtor's hands (or bank account), is justified in various ways. One line of thinking is that what occurred was simply a substitution of one similarly situated creditor for another– a wash transaction that did not diminish the net estate available for the payment of all unsecured creditors. The Court notes, however, that earmarking is not favored as a defense to an avoidance action, and the application and extension of the doctrine has been subject to criticism, especially in the Tenth Circuit.[19]

In addition, P&F did not cite–and the Court did not locate–any cases in this Circuit that address earmarking as a defense to an action to avoid an unauthorized *post-petition* transfer under Section 549(a). For purposes of the Motion, however, the Court will assume, without deciding, that an otherwise unauthorized post-petition transfer might be justified by establishing that the transferred funds were effectively earmarked, and that earmarked funds are not estate property.

The Tenth Circuit Bankruptcy Appellate Panel has identified three tests to determine whether funds were effectively earmarked for payment of a particular creditor. One test focuses on the mutual intent of the lender and the debtor that the borrowed funds are to be used to satisfy a particular debt, and requires the following to be established:

> (1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt,
>
> (2) performance of that agreement according to its terms, and

---

[19]See, e.g., Manchester v. First Bank & Trust Co. (In re Moses), 256 B.R. 641 (BAP 10th Cir. 2000) ("Moses").

(3) the transaction viewed as a whole (including the transfer in of the new funds and transfer out to the old creditor) did not result in any diminution of the estate.[20]

Other courts will find earmarking –

if the debtor lacked control over the funds supplied by the new creditor. In determining control, courts typically consider whether the new creditor restricted the use of the funds, whether the debtor had physical control over the funds, and whether the debtor had the ability to direct to whom the funds should be paid.[21]

Finally, some courts simply measure whether the transfer diminished the estate, or if the transfer simply substituted one similarly situated creditor for another.[22]

P&F's additional facts do not support its contention that earmarking occurred under any of these tests. There is no evidence that MACCO did not have unfettered access and control over the use of all deposits in the NBC Account. Nothing in the Price Declaration suggests that MACCO lacked the power to choose who would and would not be paid from the NBC Account. Nothing in the Price Declaration suggests that any entity depositing funds

---

[20]Moses, 256 B.R. at 649 (citations omitted). *Accord* Parks v. FIA Card Services, N.A. (In re Marshall), 550 F.3d 1251, 1255-56 (10th Cir. 2008) ("Parks").

[21]Id. at 650 (citations omitted). See Parks, 550 F.3d at 1256 (to the extent a debtor has the right to exercise dominion or control over the distribution of funds claimed to be earmarked, such funds are property of the estate; there is no effective earmarking if the debtor has discretion to choose how to use the allegedly earmarked funds). See also Tolz v. Barnett Bank (In re Safe-T-Brake of South Florida, Inc.), 162 B.R. 359, 365 (Bankr. S.D. Fla. 1993) ("Control has two components: first, the power to designate which party will receive the funds; and second, the power to actually disburse the funds at issue to that party. In other words, control means control over identifying the payee, and control over whether the payee will actually be paid.") (internal quotations and citation omitted).

[22]Moses, 256 B.R. at 650.

in the NBC Account restricted MACCO from using the funds for purposes other than payment of P&F.

Although Ms. Price declared that the funds used to pay P&F came from "a related, non-debtor entity," she does not identify any particular entity, nor does she describe the terms of any agreement between the unnamed contributor(s) and MACCO regarding payment to P&F. No evidence supports P&F's allegation that *Cobblestone* deposited $61,288.05 into MACCO's NBC Account to cover the payments to P&F. And although Ms. Price states that non-debtor entity funds were "specifically earmarked" for payment of P&F's fees, she does not identify any particular deposit that was allegedly earmarked, place a date on such a deposit, or attempt to trace a deposit to a payment to P&F.

An examination of transactions flowing through the NBC Account bank statement during the month of November 2010 ("Bank Statement") all but dooms P&F's claim that Cobblestone deposited funds earmarked for payment of P&F's invoice(s).[23] The Bank Statement constitutes documentary evidence of MACCO's four wire transfers to P&F. It also identifies by entity name all incoming wire transfers made by MACCO's subsidiaries to the NBC Account. The Bank Statement does not reflect a single incoming transfer from Cobblestone, or from any of the joint defendants P&F represented in the four lawsuits. Also,

---

[23]MACCO's November 2011 Monthly Operating Report, which was signed by Ms. Price under the penalty of perjury and filed in the bankruptcy case on January 5, 2011, included a copy of the Bank Statement. The Monthly Operating Report was attached to Trustee's Reply.

12

no deposit was made by any entity in an amount equal to the amount owed on any of the four P&F invoices.

To create a genuine issue of material fact, P&F was required to present "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the non-movant's evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[24] Ms. Price's vague and conclusory statement that some unnamed non-debtor entity deposited funds into MACCO's NBC Account, and "earmarked" the deposit(s) to pay P&F's invoices, is simply not sufficient to create a genuine disputed issue of fact.[25] Based on the record before the Court, "there is not sufficient evidence favoring [P&F] for a jury to return a verdict for"[26] P&F based upon P&F's earmarking defense.

[24]Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

[25]See Bancoklahoma Mortgage Co. v. Capital Title Corp., 194 F.3d 1089, 1101 (10th Cir. 1999) (An affidavit that contained "sweeping conclusory statements" and did not "mention any single transaction, date or person" was insufficient to create a genuine issue of fact. "While an affidavit is certainly an appropriate vehicle to establish a fact for summary judgment purposes, the affidavit must set forth facts, not conclusory statements.")

[26]Liberty Lobby, 477 U.S. at 249. See also Adams v. American Guarantee & Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000), citing EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000) ("An issue is 'genuine' if 'a rational jur[or] could find in favor of the nonmoving party on the evidence presented.'")

13

C.    P&F's evidentiary materials are insufficient to create a genuine issue of material fact as to whether the funds transferred to MACCO by non-debtor subsidiaries were held by MACCO in trust for payment of P&F's fees.

P&F cites Begier v. IRS[27] in support of its argument that the funds used to pay P&F were not property of the estate.[28]  In Begier, the Supreme Court held that the debtor's prepetition transfer to the IRS of taxes debtor withheld from employees' paychecks (as well as excise taxes collected) was not an avoidable preference because the debtor did not hold an equitable interest in such funds.  Section 541(d) of the Bankruptcy Code provides that property is not property of the estate to the extent that the debtor lacks an equitable interest in such property.[29]  In Begier, the Court affirmed that taxes collected or withheld by the debtor were by statute deemed to be held in a "special fund in trust for the United States."[30] Although the Court had no trouble concluding that a trust in favor of the IRS was created, by statute, at the time the debtor (1) withheld funds from its employees' pay or (2) collected the excise taxes, that was "not alone sufficient to answer the question . . . [of] whether the *particular dollars* that [debtor] paid to the IRS from its general operating accounts were 'property of the debtor'" for the purpose of determining whether the payment was an avoidable preference.[31]  The Court found that in the special context of trust-fund taxes, a

---

[27]496 U.S. 53 (1990).

[28]Response, ¶ 10.

[29]11 U.S.C. § 541(d).

[30]Begier, 496 U.S. at 60, *quoting* 26 U.S.C. § 7501.

[31]Id. at 61-62.

14

debtor's voluntary payment "of its trust-fund obligation is . . . sufficient to establish the required nexus between the 'amount' held in trust and the funds paid."[32]  In other contexts, however, under common law trust rules, "a trust is created in *property*; a trust therefore does not come into existence until the settlor identifies an ascertainable interest in property to be the trust res."[33]

None of the evidence offered by P&F in opposition to summary judgment supports any inference that the funds deposited by MACCO's subsidiaries into MACCO's NBC Account were held by MACCO in trust.  No testimony has been offered to establish that any particular entity deposited funds in the NBC Account pursuant to an express trust nor has P&F identified a trust res by tracing or otherwise.  Accordingly, based on the record before the Court, "there is not sufficient evidence favoring [P&F] for a jury to return a verdict for"[34] P&F based upon P&F's contention that MACCO had no equitable interest in the funds paid to P&F under Begier.

D.    MACCO did not have statutory authority to pay prepetition debt in the ordinary course of business.

P&F argues that MACCO's payment of its subsidiaries' legal bills was allowed in the ordinary course of MACCO's business.[35]  A case decided by the Tenth Circuit Bankruptcy

---

[32]Id. at 66-67.

[33]Id. at 62 (citations omitted).

[34]Liberty Lobby, 477 U.S. at 249.

[35]Response, ¶ 4.

15

Appellate Panel ("BAP") refutes this argument. In <u>Sholer v. Carmichael (In re PKR, PC)</u>,[36]

the trustee sued defendant Carmichael to recover a transfer the debtor-in-possesion, PKR, PC

("PKR"), a law firm, made to Carmichael to pay for prepetition expert services rendered to

PKR and PKR's client. After PKR had commenced its Chapter 11 case, PKR's client paid

PKR $4,410.00 for Carmichael's services. PKR deposited the payment in its debtor-in-

possession account, and in turn, paid Carmichael $4,410.00 from that account. The BAP

rejected Carmichael's contention that the payment was authorized under 11 U.S.C. § 1108

as made in the ordinary course of PKR's business.[37]

> "Although Code § 1108 authorizes a debtor in possession to operate its
> business interest without further order of the court, this section does not
> authorize the debtor to make postpetition payments with respect to prepetition
> debts." 4 NORTON BANKRUPTCY LAW AND PRACTICE 2d § 77:4 (William L.
> Norton, Jr., ed., 2nd ed.1994). <u>See also</u> <u>Hoffman v. Portland Bank (In re</u>
> <u>Hoffman)</u>, 51 B.R. 42, 46 (Bankr. W.D. Ark.1985) ("Section 1108 authorizes
> a debtor-in-possession to operate in business without further order of the court,
> but this section does not authorize postpetition payment of prepetition
> debts.").[38]

---

[36]220 B.R. 114 (BAP 10th Cir. 1998).

[37]Carmichael also argued that the funds PKR paid him were not property of the estate
but instead were held by PKR in constructive trust for Carmichael's benefit. The BAP
affirmed the bankruptcy court's conclusion that PKR's client's payment resulted from the
liquidation of receivables that were clearly property of the estate, and the relationship
between PKR and Carmichael was merely that of debtor and creditor (<i>i.e.</i>, PKR owed
Carmichael for prepetition services), not that of trustee and beneficiary. <u>Id</u>. at 117-19.

[38]<u>Id</u>. at 119. <u>See also</u> <u>Berry Good, LLC</u>, 400 B.R. at 745-46 ("no . . . statutory
authority allows a debtor, in a chapter 11 proceeding, to make payments on pre-petition debt
as an 'ordinary course' transaction. . . . 'Although the debtor in possession . . . may use
property of the estate in the ordinary course of business, it does not have the right to pay
prepetition claims, which would violate the Code's policy of equal treatment of similarly
situated creditors. Generally, payment of such claims must await confirmation.'") (<i>quoting</i>

In this case, even though it was within MACCO's ordinary course of its business to commingle its and its subsidiaries' funds and to pay its subsidiaries' debts from MACCO's deposit accounts,[39] MACCO's use of property of the estate to pay P&F's prepetition invoices was nonetheless prohibited. "To hold that this payment [of prepetition debt] was authorized by §§ 1107 and 1108, which [sections] permit a debtor in possession to continue to operate the bankrupt business, would clothe the debtor with power to treat unsecured creditors differently . . . counter to one of the fundamental purposes of bankruptcy–equal treatment of unsecured creditors."[40] Once funds were deposited into MACCO's NBC Account, MACCO's exclusive control over the disposition of the funds became property of the estate and as such, was limited and restricted by the Bankruptcy Code.

Because an operating debtor-in-possession is not authorized under the Bankruptcy Code to pay prepetition debts with estate funds, and the payments to P&F were not

Feeney, Bankruptcy Law Manual § 11A:25 (Thomas/West 2008)); Scharffenberger v. Billmire (In re Allegheny Health, Education and Research Foundation), 313 B.R. 673, 677-78 (Bankr. W.D. Pa. 2004).

[39]In its Response, P&F states that "it is undisputed that Macco Properties, Inc. was a debtor-in-possession at the time the wire transfers were sent to the Defendant, and was operating in the ordinary course of business with regard to the related LLCs, including paying some of their expenses, bills and retaining outside counsel for their legal matters." Response, ¶ 4.   MACCO's unauthorized practice of commingling MACCO's funds with other entities' funds (which involved commingling various lenders' cash collateral), and paying random entities' debts with such commingled funds (the "robbing Peter to pay Paul" doctrine) was one of the principal reasons that the United States Trustee and creditors sought the appointment of a Chapter 11 Trustee, and one of the reasons Judge Jackson declined to grant Ms. Price's request to enjoin, limit, or terminate Trustee's powers.

[40]Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.), 930 F.2d 458, 465 (6th Cir. 1991).

17

authorized by Court order, MACCO's post-petition payments for P&F's prepetition services are avoidable under 11 U.S.C. § 549(a).

E.     P&F's other alleged disputed facts are immaterial.

In addition to asserting that the funds transferred to P&F were earmarked and that the payments were made in the ordinary course of MACCO's business, Ms. Price, in her declaration, states that "[t]he wire transfers were necessary to cover checks that were written pre-petition that were not honored by the bank once Maaco [sic] filed for bankruptcy in November"[41] and that "Lew McGinnis and I specifically talked to the U.S. Trustee about how to handle payment on Pinkerton's bills since the checks were not honored, and were told that the entities could not lend each other money, but that if the funds were not Maaco's [sic] to begin with, it was acceptable to transfer the funds to avoid incurring additional post-petition debt."[42]

"A fact is 'material' if under the substantive law it could have an effect on the outcome of the lawsuit."[43]  The reason given for making the post-petition wire transfers – to cover dishonored checks written prepetition – is not relevant to prove or disprove any element of Section 549.  Further, regardless of what the United States Trustee advised, it is undisputed that MACCO did not obtain Court authority to pay P&F for prepetition services from estate

<hr />

[41]Price Declaration, ¶ 5.

[42]Id. ¶ 6.

[43]Adams v. American Guarantee & Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000), citing EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000).

18

property. Neither of these facts are material to establishing any legitimate defense to Trustee's avoidance claim.

**CONCLUSION**

For the reasons stated herein, the Court finds and concludes that there is no genuine issue as to any material fact and Trustee is entitled to judgment as a matter of law. Trustee is entitled to avoid and recover from P&F the full amount of the wire transfers, $61,288.05, for the benefit of the MACCO estate. A judgment will be entered contemporaneously herewith.

**SO ORDERED** this 23rd day of May, 2016.

DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE